UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:23-CR-00009 (CJN) |
| v. : | |
| : | |
| GABRIEL BROWN : | |
| : | |
| Defendant : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Gabriel Brown to 45 days' incarceration, approximately one-fourth of the applicable Sentencing Guidelines range, one year of supervised release, 60 hours of community service, and $500 in restitution. Brown was part of a violent mob that assaulted members of the news media and destroyed property associated with the news media at the east front of the Capitol on January 6, 2021.

### I. Introduction

Defendant Gabriel Brown participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Brown pleaded guilty to one count of one count of violating 18 U.S.C. 1752(a)(2) intentionally impeding or disrupting the orderly conduct of government business or official

1

functions, within proximity to a restricted building or grounds, and one count of violating 40 U.S.C. § 5104(e)(2)(F), an act of physical violence on Capitol Grounds. A sentence of incarceration and a term of supervised release is appropriate in this case because Brown participated in the assault on the media staging area and incited violent acts of destruction.

The Court must also consider that Brown's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. As explained below, Brown merits a sentence of incarceration because he stomped on media equipment, filmed the destruction of equipment, incited other rioters to steal and destroy the media equipment and shouted his intent to shut down the media as he did so, and shouted through a bullhorn outside the west entrance of the Capitol for seven minutes that: "You stole the Senate from us, you stole the House from us, and now you want to take peaceful revolution from us? Well you better prepare for fucking violent revolution." Here, the facts of and circumstances of Brown's crime support a sentence of 45 days of incarceration and one year of supervised release.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.

*Defendant Brown's Role in the January 6, 2021 Attack on the Capitol*

Brown traveled to Washington, D.C., from his residence in New York prior to January 6, 2021. On January 6, in the afternoon, Brown went to the Capitol grounds.

At approximately 4:50 p.m., a large crowd made its way to and/or past a media staging

area that was set up outside the northeast corner of the U.S. Capitol, on U.S. Capitol grounds. As individuals moved past metal barricades that had been set up around the staging area, media members were forced to flee the area before recovering all their cameras and associated equipment. Numerous members of the crowd began to destroy the equipment, including cameras, tripods, lights, shades, and remote broadcasting equipment that belonged to various media outlets. Numerous members of the crowd yelled inflammatory rhetoric against the members of the media. One member of the media who was forced to flee the scene estimated that the equipment from his particular news organization that was destroyed was valued at between $30,000 and $34,000. Image 1 below depicts the staging area after the members of the news media had been forced to flee.



**Image 1**
Screen shot from open-source, showing rioters destroying media equipment at the media staging area on Capitol grounds. *Brown is not visible in this screen shot.*

At approximately 5:00 p.m., Brown approached the media staging area outside the northeast corner of the Capitol. There, Brown stomped on media equipment that belonged to media outlets and encouraged others to steal and destroy media equipment. A publicly available video depicts Brown stomping on a media equipment cart (at approximately 1:34 into the video) and kicking a media equipment case (at approximately 1:40 minutes into the video). Still images from the video capturing that conduct are depicted below in Images 2A and 2B.



**Image 2A**



**Image 2B**

*From a publicly available video located at https://youtu.be/L1bLZaKlJdg*

Brown also recorded his own video regarding the destruction of the property in the media staging area, wherein he is captured encouraging other rioters to continue the destruction. Specifically, at approximately 1:39 minutes into the video Brown stated, "Yeah, fuck yeah. Take a souvenir. Fuck yeah." At approximately 1:46 minutes into the video, Brown stated, "Anything good in there? Yeah, smash that shit" as another rioter stomped on a case containing media equipment, as shown in Image 3, below.



**Image 3**
Screen shot from an open-source video
(https://www.youtube.com/watch?v=_Tg_SJh9b_A) showing Brown (signaled by orange arrow) encouraging another rioter who was stomping on media equipment

At approximately 6:30 minutes into the video Brown yelled, "They're allowed to do this. You didn't want to do your fucking job. Well, you know what, now you can't. You know what, the media did not want to do its job so now they fucking can't. We'll do it! We got the cameras. We got the freaking voice. We're going to go out and do it." At approximately 7:22 minutes into the video, Brown stated, "Their legacy is dead. It's dead right here." At approximately 10:24 minutes Brown further yelled, "Fuck the AP. You fucking frauds. You want to fucking lie about all of us. Well, you know what, here, report this shit! Because your fucking media is dead mother fucker. It's dead, the legacy media is dead." This video is being submitted as **Exhibit 1**.

In addition to his criminal conduct in the media staging area, Brown was also present immediately outside the western entrance of the U.S. Capitol, in a restricted area, with a bullhorn earlier in the afternoon. There, he threatened violence against his perceived enemies and encouraged like-minded persons who were nearby to resort to violence during an already violent

riot. Specifically, he yelled to others around him through the bullhorn, at approximately the 2-minute mark, "You stole the Senate from us, you stole the House from us, and now you think you're going to steal the presidency from us? Let me tell you something – you want to take peaceful revolution away from us? Well you better prepare for fucking violent revolution. . ." Brown also yelled at officers, who he referred to as "oathbreakers," and said "where were you for the nine months Antifa and BLM burned down everything in D.C." He repeatedly shouted that the rioters were staying, and that they were ignoring the curfew. Brown yelled into the bullhorn for approximately seven minutes while on the western entrance of the U.S. Capitol. This video is being submitted as **Exhibit 2**.

After the riot, Brown was interviewed by individuals who later shared the interview on YouTube.

*The Charges and Plea Agreement*

On June 23, 2021, the United States charged Brown by criminal complaint with violating 40 U.S.C. § 5104(e)(2)(F), 18 U.S.C. §§ 1752(a)(1) and (a)(2), and 18 U.S.C. § 1363. On June 30, 2021, law enforcement officers arrested him at his residence. On January 6, 2023, the United States charged Brown by a two-count Information with violating 40 U.S.C. § 5104(e)(2)(F) and 18 U.S.C. § 1752(a)(2). On February 8, 2023, pursuant to a plea agreement, Brown pleaded guilty to both counts of the Information. By plea agreement, Brown agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Brown now faces sentencing on one count of violating 40 U.S.C. § 5104(e)(2)(F) and one count of violating 18 U.S.C. § 1752(a)(2).  As noted by the plea agreement and the U.S. Probation Office, he faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised

release of up to one year for Count One, and six months of imprisonment, a term of up to five years of probation, and a fine of up to $5,000, for Count Two. Brown must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. Id. at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Brown's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | +4 |

See PSR at ¶¶32-40.

The U.S. Probation Office calculated Brown's criminal history as a category I. PSR at ¶ 43. Accordingly, the U.S. Probation Office calculated Brown's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at

8

¶ 73. Brown's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 45 days' incarceration, and one year of supervised release.

#### A.     The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Brown's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

One of the most important factors is Brown's participation in and celebration of destruction of media equipment during the riot.  Brown repeatedly yelled at members of the media, and

9

encouraged other rioters to steal and destroy their property. In doing so, Brown was attacking the free press, and the means by which citizens are kept informed about their government and current events. In addition, Brown used a bullhorn for over 7 minutes on the terrace immediately outside the western entrance of the U.S. Capitol to further incite rioters to take over the Capitol. He yelled at law enforcement officers who were protecting the Capitol, and derogatorily referred to them as "oathbreakers."

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of 45 days' incarceration and.a year of supervised release.

### B. The History and Characteristics of Brown

Brown is 40 years old and does not have a criminal history. He has been intermittently employed, most recently as a ride-share operator. PSR at ¶ 62.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).  Additionally, although Brown did not enter the Capitol, but he engaged in destructive and violent activity towards members of the media who were lawfully on the Capitol Grounds doing their jobs by keeping citizens and the world apprised of what was occurring on that date. Brown also incited other rioters on the upper

west plaza. As with the nature and circumstances of the offense, these factors support a sentence of incarceration.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. At 46 ("I don't think

11

that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

A period of incarceration is warranted in order to deter Brown from engaging in such activities in the future.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from violence on Capitol Grounds misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[1] This Court must sentence Brown based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Brown has pleaded guilty to a two-count information. Count 1 charged him with intent to impede or disrupt the orderly conduct of government business or official functions, within proximity to any restricted building or grounds.  This offense is a Class A misdemeanor to which the guidelines apply. Count 2 charged him with an act of physical violence on Capitol Grounds. This offense is a Class B misdemeanor. Certain Class B and C misdemeanors, such as the offense

---

[1] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

charged in Count 2 and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), apply.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier

13

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This case is comparable to two other cases involving actions on the media staging area, in which the defendants received a sentence of 45 days' imprisonment for similar conduct.

In *United States v. Katherine Stavely Schwab,* 21-cr-050 (CRC), the defendant anticipated and prepared for potential violence on January 6; she chose to join the crowd at the Capitol after learning that it was the site of an ongoing riot; when entering the Capitol, she could see broken windows and hear blaring alarms; after she exited from the Capitol building, she saw and recorded video on her phone of police officers struggling to disperse the crowd; she shouted epithets at the

14

officers who were valiantly trying to protect the Capitol and its lawful occupants, calling them "traitors" and thereby possibly inflaming the crowd; she shouted for others to resist police efforts to disperse the crowd; outside the Capitol, she joined a Facebook livestream and announced that she "stood her ground"; like Brown, as rioters violently destroyed press equipment in a media enclosure, she joined others in shouting insults intended to incite further violence; she then joined the violence, throwing and kicking press equipment.  Schwab later lied to the FBI about her unlawful conduct on January 6. Upon Schwab's guilty plea to a violation of 18 U.S.C. § 1752(a)(2), one of the offenses to which Brown pled guilty, Judge Cooper sentenced Schwab to 45 days' incarceration. Like Schwab, Brown chose to join the crowd at the Capitol after learning that it was the site of an on-going riot; as rioters violently destroyed press equipment, Brown joined in the violence, and incited others to commit acts of violence. Brown shouted his intention to shut down the "fucking" media as he did so.  Although Brown did not enter the Capitol, he incited other rioters by yelling about stolen elections and preparing for violent revolution through a bullhorn immediately outside the western entrance. Given the similar conduct and offense to which Brown pled guilty, a sentence similar to what was imposed on Schwab is appropriate here.

Similarly, in *United States v. Eric Barber,* 21-cr-228 (CRC), the defendant prepared for violence by wearing a Kevlar ballistic helmet to Washington, D.C.; heard the crowd yelling "Hang Mike Pence" and saw the gallows erected by the rioters but entered the Capitol nonetheless, via a broken window; witnessed violence against police as he wandered through the Capitol; stole a power station from a C-Span media station; participated in a media interview in which he lied about entering the Capitol; and had a substantial criminal history, including a prior conviction for breaking and entering. Upon his conviction of violation 40 U.S.C. § 5104(e)(2)(G), the Court sentenced him to 45 days' incarceration.

15

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence defendant to 45 days' incarceration, one-year supervised release, 60 hours community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty because of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:      *s/Jennifer Blackwell*
         Jennifer Leigh Blackwell
         Assistant United States Attorney
         United States Attorney's Office
         For the District of Columbia
         D.C. Bar No. 481097
         Jennifer.blackwell3@usdoj.gov
         (202) 803-1590

17