# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------X
UNITED STATES OF AMERICA          :
                                  :
        v.                        :
                                  :          23-CR-9 (CJN)
Gabriel Brown,                    :
                                  :
                Defendant.        :
------------------------------------------------------X

## <u>GABRIEL BROWN'S SENTENCING MEMORANUM</u>

Gabriel Brown, through his attorney, Evan Sugar, submits this memorandum in advance

of sentencing. Mr. Brown respectfully requests this Court sentence him to a period of probation,

in accordance with the recommendation of the Department of Probation.

## I.    Introduction

On January 6, 2021 Gabriel Brown committed the first—and last—crimes of his life.

Stirred up by misinformation, conspiracy theories, and inflammatory rhetoric, Mr. Brown went

to Washington D.C. to protest what he viewed as a fraudulent election. He sincerely believed that

with the cooperation of the mainstream media, the Democratic Party had stolen the election from

President Trump, and delivered it to Joe Biden. He was wrong. Not just in his theories about the

election, but in the actions he took as a result of them.

1

To his credit, Mr. Brown took responsibility for these wrongs immediately.[1] He does not make excuses for his conduct, nor does he minimize it. He accepts responsibility and simply asks this Court for mercy. While Mr. Brown offers no excuses for his conduct, as his lawyer I am compelled to provide some mitigating arguments related to the offense conduct.

Mr. Brown did not enter the Capitol building. Mr. Brown engaged in some offensive, incendiary, and perhaps even inciting rhetoric outside of its doors, but he remained outside. Many people engaged in similar rhetoric that day, some from the stage of the "Save America" rally at the Ellipse. It does not make the words Mr. Brown spoke that day less offensive, but it also does not make him an outlier.

Mr. Brown's role in the destruction of press equipment was limited. Mr. Brown kicked a spool of cable in a pile of already destroyed equipment. He encouraged other people in the crowd to damage the property. Again, he should not be excused for the conduct, but he was not alone, and far from the most culpable, even in the group who damaged that specific equipment.

Mr. Brown did not put a hand on another human being on January 6. He did not assault any members of the press or of law enforcement. Ordinarily, in a civilized society, one should not be given a pat on the back for refraining from committing acts of violence against anyone, let alone journalists or police. That is of course also the case here; Mr. Brown deserves no credit for his relative peacefulness that day. However, it should not be lost on this Court that dozens of people—many of whom had lived otherwise law-abiding lives—did commit serious acts of violence that afternoon. Such was the fervor in that crowd. Thousands of people abandoned their principles and their decency, and behaved like a mob behaves, unattached to the basic decorum

---

[1] Due to the size of the investigation in this case and the associated backlog, a plea agreement was provided to Mr. Brown in October of 2022. He agreed to the plea in the case in his first meeting with me after its receipt and I communicated that to the AUSA in December of 2022. Mr. Brown waived his speedy trial rights while he waited for the agreement.

that allows our country to function. Gabriel Brown was among those who lost themselves on January 6, but placed in the context of that day and of his life, he did so in a relatively minor way. He did so in a way that merits probation, not jail.

## II.      Mr. Brown's History and Characteristics

Mr. Brown turned 40 a few weeks ago. His first 38 years were relatively mundane if a bit sad. He grew up in the middle-class pocket of one of the wealthiest suburbs of New York City. Billy Joel and Rupert Murdoch lived a few miles down the road. That was not Mr. Brown's life though. His father was a mechanic and his mother a homemaker. He did not live in poverty, but he was a long way from luxury. His basic needs were provided for, and that was about it. Extra money, extra love and support, extra help, were not a part of his upbringing.

Mr. Brown did not excel in either academics or athletics while in school. His learning disability consistently put his grades at the bottom of the class. His asthma and short stature left him last to be picked for sports. This combination of his family's modest financial means, and his height, learning disability, and asthma, led to a childhood of vicious bullying. He was the poor, dumb kid to his classmates, something they made sure he was aware of. The name calling and bullying lasted for years, and no one in the school or at home did anything to put a stop to it.

This sort of upbringing can stunt a person. It probably has stunted Mr. Brown. He feels (rightfully) resentful for the cruelty. He feels (rightfully) betrayed by his parents who did nothing to intervene. He has tried to move on but has never truly gotten over it. Somewhat ironically, this case has moved the needle on that front rather significantly. Mr. Brown lived one day where his anger got the better of him and has now lived the two years since staring at the potential consequences. These last two years have been a period of deep reflection for Mr. Brown. He has always been a man who believed profoundly in abiding by the law, and has always held those

who serve in law enforcement in the highest esteem. And on January 6, 2021 he betrayed those values, and now must contend with the legal consequences, and the crushing shame.



In addition to processing the shame and regret for his actions on January 6, Mr. Brown has lived a productive and law-abiding life since his arrest. He has continued his seasonal work at Hegemans Farm and has made some extra money driving for Uber. Like the 38 years before January 6, he has stayed out of trouble and followed the rules. He has demonstrated that his actions on January 6 were the exception, not the rule.

Mr. Brown is also an important and valued member of his community. For years he has



done volunteer work with the North Oyster Baymen's Association to help keep Oyster Bay clean and safe for fishing and recreation. I ask the Court to consider that, along with the character letters written by friends and family, when crafting an appropriate sentence.[2]

---

[2] Exhibit A

Finally, Mr. Brown has been in perfect compliance with the supervision of Pretrial

Services. This speaks both to his characteristics, and his suitability for a sentence of probation.

Should this Court choose probation in Mr. Brown's case, it should have no doubt that he will

comply with any and all conditions and be a model supervisee.

### III.    The Conditions of Confinement

Should Mr. Brown be sentenced to prison, he will enter a system that is deteriorating and

in crisis. Covid restrictions, mismanagement, and a lack of accountability have turned the federal

prisons in this country into a thing of nightmares. Just 5 weeks ago there was a national report of

a deteriorating federal prison infrastructure to the tune of $2 billion.[3] The stories of sickness and

violence in federal prisons around the country since the onset of the pandemic are staggering. In

a case such as this, where many similarly situated defendant's have been sentenced to non-jail

sentences, subjecting him to such conditions would be greater than necessary to address the

criminal conduct.

In recognition of the excessively punitive conditions of pretrial detention or post-

judgment incarceration during the pandemic, judges in Mr. Brown's local districts have granted

leniency in many cases. These courts have acknowledged that the unusual harshness of

incarceration during these times diminishes the retributive or deterrent need for a guidelines

sentence. And they have imposed terms of imprisonment, including time-served sentences that

are substantially less than the bottom of the defendants' advisory ranges.  *See, e.g*., *United States*

*v. Colon*, No. 15-cr-317 (MKB) (E.D.N.Y. Nov. 20, 2020) (imposing 18 months, consecutive to

---

[3] Luke Barr, *All 123 US federal prisons need 'maintenance': Inspector general*, ABC News (May 25, 2023), available at https://abcnews.go.com/amp/Politics/123-us-federal-prisons-maintenance-inspector-general/story?id=99601450

defendant's 18-month state sentence, where bottom of guidelines was 100 months); *United States v. Shi*, No. 19-cr-451 (PKC) (E.D.N.Y. Nov. 2, 2020 (imposing no prison where guidelines range was 12-18 months); *United States v. Piper*, No. 18-cr-008 (AMD) (E.D.N.Y. June 25, 2020) (imposing time-served sentence on resentencing where defendant had served approximately 24 months and bottom of guidelines range was 63 months); *United States v. Vinas*, No. 20-cr-44 (EK) (E.D.N.Y. Apr. 20, 2020) (imposing three-month sentence where bottom of guidelines range was eight months); *United States v. Hendryx*, No. 18-cr-478 (ENV) (E.D.N.Y. May 22, 2020) (departing downwardly 25% from bottom of guidelines range in felon-in-possession case). *See also, e.g.*, *United States v. Almonte*, No. 19-cr-621 (RA) (S.D.N.Y. Jan. 14, 2021) (imposing 15-month sentence where bottom of guidelines range was 51 months); *United States v. Polanco*, No. 20-cr-94 (AJN) (S.D.N.Y. May 15, 2020) (departing downwardly 60% in illegal reentry case and imposing time-served sentence); *United States v. Garcia*, No. 19-cr-593 (PAC) (S.D.N.Y. Dec. 3, 2020) (imposing 48-month sentence where bottom of guidelines range was 110 months); *United States v. Camacho*, No. 19-cr-389 (CM) (S.D.N.Y. Nov 19, 2020) (imposing time-served sentence where bottom of guidelines range was 57 months); *United States v. Paulino*, No. 19-cr-607 (AJN) (S.D.N.Y. Oct. 21, 2020) (imposing time-served sentence where bottom of guidelines ranges was 27 months); *United States v. Cirino*, No. 19-cr-323 (JSR) (S.D.N.Y. July 21, 2020) (imposing 10-month sentence where bottom of guidelines range was 57 months); *United States v. Aracena de Jesus*, No. 20-cr-19 (PAE) (S.D.N.Y. July 1, 2020) (imposing time-served sentence in illegal reentry case where bottom of guidelines range was 30 months); *United States v. Casillas*, No. 19-cr-836 (S.D.N.Y. May 4, 2020) (imposing time-served sentence in illegal reentry case where bottom of guidelines range was 15 months).

In determining how much prison time, if any, is necessary to punish Mr. Brown for his

6

crime, the Court should weigh the increased danger and diminished conditions to which he would be subjected when determining the "total harm and benefits to prisoner and society" that additional imprisonment would yield. *United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *see Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention). As Judge Rakoff held, "The pandemic, aside from posing a threat to [the defendant's] health, has made…incarceration harsher and more punitive than would otherwise have been the case. This is because federal prisons, as 'prime candidates' for the spread of the virus (citation omitted), have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020).

## IV.     Need to Avoid Unwanted Sentencing Disparities

There have perhaps never been a group of cases that implicate 18 U.S.C. §3553(a)(6) as directly as the cases surrounding January 6. The prosecutions are the culmination of the largest criminal investigation in United States history and involve hundreds of largely indistinguishable defendants. Consistency in sentencing should be paramount, particularly as it relates to this very large and very public prosecution.

As of June 22, 2023, the government had secured convictions against 199 defendants to

7

whom they recommended sentences of incarceration of 45 days or less.[4] Of those, only 89 received a jail sentence, 13 of those being short intermittent sentences.[5] More than a third of the 89 received jail sentences shorter than those requested by the government.[6] Of the 89, some had criminal records, some entered the Capitol, some damaged government property. Of the 89, some expressed no remorse, some did poorly on supervision, some the Department of Probation recommended jail sentences. None of those factors are present here.

Mr. Brown should be in the group of defendants where the government requested a non-jail sentence. Not finding himself there he should squarely land in the group of 110 who did no jail time after a government request of a short period of incarceration. Through his conduct, both before and after the aberration of January 6, Mr. Brown has demonstrated that a jail sentence is unnecessary to accomplish any of the goals outlined in 18 U.S.C. §3553.

## V.    Conclusion

When the Court considers the totality of the information available—Mr. Brown's difficult upbringing, his otherwise law abiding and productive life, the conditions of any possible confinement, and the sentences of similarly situated defendants, I submit the just conclusion is that a sentence of probation is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

Respectfully submitted,

Evan Sugar, Esq.
Assistant Federal Defender

---

[4] https://www.justice.gov/usao-dc/capitol-breach-cases
[5] *Id.*
[6] *Id.*

8